[Cite as *In re E.J.*, 2011-Ohio-5736.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

**IN THE MATTER OF:**

    **E. J.,**                            **CASE NO.  9-11-11**

**[RICHARD BARNETT,**
      **APPELLANT/FATHER]**              **O P I N I O N**
**[AMY JERVIS,**
      **APPELLANT/MOTHER].**

**IN THE MATTER OF:**

    **K. J.,**                            **CASE NO.  9-11-12**

**[RICHARD BARNETT,**
      **APPELLANT/FATHER]**              **O P I N I O N**
**[AMY JERVIS,**
      **APPELLANT/MOTHER].**

**Appeals from Marion County Common Pleas Court**
**Family Court Division**
**Trial Court Nos. 2008 AB 0017 and 2008 AB 0016**

**Judgments Affirmed**

**Date of Decision:   November 7, 2011**

Case Nos. 9-11-11 and 9-11-12

**APPEARANCES:**

    *Kevin P. Collins* **for Appellant, Richard Barnett**

    *Dustin Redmond* **for Appellant, Amy Jervis**

    *John A. Minter* **for Appellee, Marion Co. Children Services**

    *Maria Lisa Hypes,* **Guardian Ad Litem**

**SHAW, J.**

**{¶1}** Mother-appellant, Amy Jervis ("Amy"), and father-appellant, Richard Barnett ("Richard"), appeal the February 23, 2011 judgment of the Marion County Court of Common Pleas, Family Court Division, granting permanent custody of their children, E.J. and K.J., to appellee, Marion County Children Services Board ("the Agency").

**{¶2}** In February of 2008, Amy gave birth to twin girls, E.J. and K.J., while incarcerated at the Ohio Reformatory for Women. Shortly thereafter, the Agency sought emergency custody of the children, which was subsequently granted by the trial court. The children were placed in foster care. On March 7, 2008, the Agency submitted a case plan, which was also approved by the trial court. At this time, Richard was contacted by the Agency, notified of the children's temporary placement with the Agency, and requested to submit to genetic testing to establish

-2-

paternity. The Agency offered Richard visitation with the children, but he declined until paternity was determined.

{¶3} On June 9, 2008, the children were found to be dependent based upon Amy's stipulation. As a result, the Agency's temporary custody of the children was continued. Paternity of the children was still undetermined at this time.

{¶4} The trial court ordered Richard to report to the Marion County Child Support Enforcement Agency on July 10, 2008, to complete genetic testing. Richard failed to comply with this order and did not appear for paternity testing.

{¶5} On July 30, 2008, Amy was released from prison and began attending visitation, physical therapy appointments for the children's disabilities, and court hearings.

{¶6} In September of 2008, the Agency requested the trial court terminate its temporary custody of the children, and asked that E.J. and K.J. be returned to Amy's care. The trial court subsequently granted the Agency's motion terminating the Agency's temporary custody of the children and granting Amy custody of E.J. and K.J. effective September 8, 2008. The trial court also ordered the Agency to have protective supervision of the girls during this time. The Agency developed a new case plan implementing the goals that Amy provide for the girls' basic needs, comply with mental health and alcohol and drug counseling,

participate in parenting classes and abstain from drugs and alcohol and criminal activity.

{¶7} Just two weeks later, on September 22, 2008, the trial court granted emergency custody of E.J. and K.J. to the Agency based upon a motion it filed alleging that eight-month-old K.J. tested positive for opiates after swallowing a pill; that Amy was smoking crack in the children's presence; that she was leaving the girls in their car seats for long periods of time and; that she left the children home alone on one occasion. The trial court granted the Agency temporary custody of E.J. and K.J., and they were again placed in a foster home. One day later, Amy was convicted of persistent disorderly conduct in an incident unrelated to this case.

{¶8} Throughout this time, the Agency kept Richard apprised of the children's situation, including all the court dates involving the children's placement. Richard still refused to participate in the case until paternity was proven. However, he made no efforts to effectuate the completion of genetic testing.

{¶9} The Agency continued to work with Amy on the case plan and provided bus passes for her to visit the children. Amy attended 21 of 31 scheduled visits with the girls, and attended 14 of 24 of the girls' physical therapy appointments. However, Amy continued to fail random drug screens and did not

abstain from criminal activity. On November 10, 2008, Amy was convicted of driving under suspension. On November 12, 2008, Amy was convicted of theft. On December 8, 2008, Amy was convicted of driving under suspension and possession of drug paraphernalia. As a result of some of these charges, Amy was incarcerated at the Multi-County Correctional Center from December 8, 2008 to January 7, 2009.

{¶10} Nearly a year after the children were born, Richard was determined to be the children's biological father in January of 2009.[1] Richard maintained that the delay in completing testing was due to the fact that he lived in Columbus and the children were in Marion. The Agency arranged for Richard to complete the genetic testing in Franklin County, which eventually prompted him to submit to testing.

{¶11} In April of 2009, Amy continued to test positive on drug screens and failed to complete a mental health assessment. Richard had no contact with the children even though his paternity had been established. During this time, Amy was again incarcerated in the Delaware County Jail.

{¶12} On May 1, 2009, the Agency moved for permanent custody of the children, citing that the children cannot be placed with either parent within a

---

[1] We note that there are two dates referring to the establishment of Richard's paternity in the record. The Agency's case plans indicate that Richard completed genetic testing on November 20, 2008. However, Richard's paternity was not legally established until January of 2009.

reasonable amount of time or should not be placed with either parent. On June 29, 2009, the trial court appointed a guardian ad-litem ("GAL") to the case.

{¶13} On August 10, 2009, Richard was appointed counsel. The trial court scheduled adjudication and disposition hearings to take place on February 1 and 2, 2010. In October of 2009, the Agency added Richard to the case plan. On December 9, 2009, Richard filed a motion requesting visitation with E.J. and K.J. At this time, Amy was incarcerated in the Ohio Reformatory for Women for a drug trafficking charge with an expected release date in October of 2011.

{¶14} On December 14, 2009, Amy also filed a motion for visitation requesting the Agency transport E.J. and K.J. to the Ohio Reformatory for Women so that she could visit with the children. In response to these motions, the trial court noted that both Amy and Richard have substantially failed to exercise parenting time with the children since they were placed in the Agency's custody in February of 2008, and have failed to comply with the case plan. Nevertheless, the trial court ordered the Agency to facilitate supervised visitation for each parent with the children. Richard's visits were to occur in Marion and Amy's at the Ohio Reformatory for Women. On January 21, 2010, Richard missed his first scheduled visitation with the children, without explanation.

{¶15} On February 1, 2010, the trial court conducted the adjudication hearing on the case. Several witnesses testified including Amy, Richard and those

integral to the case plan. At the conclusion of the evidence, the trial court made a second finding of dependency with regard to E.J. and K.J.

{¶16} On February 2, 2010, the trial court conducted the dispositional hearing. The trial court concluded that because Richard was part of the case plan for only four months, he had not had an adequate opportunity to reunify with E.J. and K.J. Upon agreement of the parties, the Agency dismissed its motion for permanent custody. The trial court ordered the children to remain in the Agency's temporary custody and also ordered the Agency to continue to facilitate weekly-supervised visits with Richard and the children at the agency, and to assist Amy with having monthly-supervised visits with the children at the Ohio Reformatory for Women. Both parents were ordered to comply with the case plans. These orders were journalized in the trial court's March 12, 2010 Judgment Entry.

{¶17} After the adjudicatory hearing, Richard attempted to exercise regular visitation with the E.J. and K.J. After Richard regularly exercised his visitation, the Agency arranged for him to have weekly four-hour offsite visits with the girls. However, the Agency continued to express concern to Richard about his lack of appropriate housing for the children and his unstable income, specifically the Agency questioned Richard's ability to take care of the two-and-a-half-year-old twin girls.

{¶18} On October 19, 2010, the Agency moved for permanent custody of the children, stating that the children have been in its care for twelve or more months of a consecutive twenty-two month period pursuant to R.C. 2151.141(B)(1)(d), and that the children cannot be placed with either parent in a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(B)(1)(a).

{¶19} On January 3, 2011, the trial court conducted the dispositional hearing in the case. Several witnesses testified including Amy, Richard, the two Agency caseworkers involved in the case, the GAL for the children and the psychologist who completed a mental assessment of Richard in accordance with the case plan. On February 23, 2011, the trial court entered judgment finding by clear and convincing evidence that it is in the best interest of children to grant permanent custody to the Agency. Specifically, the trial court noted Richard's lack of commitment to completing the case plan and his achievement of the goals in the case plan which only required minimal effort.

{¶20} Amy and Richard subsequently filed their respective notices of appeal, asserting the following assignments of error.

### RICHARD'S ASSIGNMENT OF ERROR NO. I

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO PROVE CLEARLY AND CONVINCINGLY THAT THE**

**CHILDREN COULD NOT BE PLACED WITH FATHER WITHIN A REASONABLE AMOUNT OF TIME.**

**RICHARD'S ASSIGNMENT OF ERROR NO. II**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO PROVE CLEARLY AND CONVINCINGLY THAT IT WAS IN THE CHILDREN'S BEST INTEREST TO BE PLACED IN APPELLEE'S PERMANENT CUSTODY.**

**RICHARD'S ASSIGNMENT OF ERROR NO. III**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO PROVE CLEARLY AND CONVINCINGLY THAT MCCS MADE REASONABLE EFFORTS TO ELIMINATE THE CONTINUED REMOVAL OF THE CHILDREN FROM RICHARD'S HOME OR TO MAKE IT POSSIBLE FOR THE CHILDREN TO RETURN SAFELY TO RICHARD'S HOME.**

**RICHARD'S ASSIGNMENT OF ERROR NO. IV**

**THE DECISION OF THE FAMILY COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**AMY'S ASSIGNMENT OF ERROR**

**THE COURT ERRED IN FINDING THAT BOTH CHILDREN CANNOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE AMOUNT OF TIME OR SHOULD NOT BE PLACED WITH THEIR PARENT.**

**{¶21}** For ease of discussion, we elect to address the assignments of error out of the order in which they are presented and to address Richard's first, second and fourth assignments of error and Amy's assignment of error, which are interrelated, together.

*Richard's Third Assignment of Error*

**{¶22}** In his third assignment of error, Richard argues that the trial court erred when it found that the Agency made reasonable efforts to return E.J. and K.J. to his custody.

**{¶23}** The Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; see, also, *In re Brown* (1994), 98 Ohio App.3d 337, 344, 648 N.E.2d 576. Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3rd Dist. No. 1–01–75, 2001–Ohio–2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id*. Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id*. "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3rd Dist. Nos. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 10.

**{¶24}** In the case *sub judice*, the trial court concluded the following with regard to the Agency's efforts to reunify the children with their parents.

> **MCCS has made reasonable efforts to prevent the removal of the children from their home with the parents, eliminate the continued removal of said children from the parents' home, and taken steps to make it possible for the children to return safely home, but both parent's failure to work with MCCS in achieving the goals and objectives of the Case Plan in this regard, have prevented the same from occurring. MCCS has made reasonable efforts to prevent the need for placement and reasonable efforts to finalize the children's permanency plan.**

(JE, Feb. 23, 2011 at 9).

**{¶25}** The record demonstrates that the Agency first contacted Richard by mail in March of 2008, after Amy identified him as the children's father. Jennifer Johnson, the caseworker on the case at the time, testified that in May of 2008, she spoke to Richard on the phone and informed him of the children's temporary placement with the Agency. Ms. Johnson testified that the Agency was willing to arrange Richard's visitation prior to the establishment of paternity. Ms. Johnson recalled that Richard wanted to establish paternity before becoming involved in the case. As possible alternatives to placement with the Agency, Ms. Johnson also spoke with Richard's mother and sister to see if they were able to care for the girls. According to Ms. Johnson, both family members were unwilling to take custody of E.J. and K.J.

-11-

**{¶26}** The Agency arranged for Amy, Richard and the children to complete genetic testing in Marion on July 10, 2008. However, Richard did not complete genetic testing until November of 2008, once the Agency arranged for the testing to take place in Franklin County, closer to his residence. After paternity was established, Ms. Johnson testified that Richard took no affirmative steps to reunify with E.J. and K.J. Ms. Johnson explained she did not have much contact with Richard. However, Ms. Johnson testified that every time she contacted Richard, she offered him visitation with the girls, which he declined. Ms. Johnson also attempted to complete a home study of Richard's residence so that the reunification process could move forward. Ms. Johnson recalled that the home study did not occur at that time because Richard said he was in the process of moving and subsequently failed to provide her with a forwarding address.

**{¶27}** The record demonstrates that despite Richard's lack of involvement in the case, Ms. Johnson continued to keep him apprised of E.J. and K.J.'s placement by sending him copies of the case plans and invitations to the semi-annual reviews, as well as copies of those reviews. Ms. Johnson testified that she contacted Richard monthly asking him to inform the Agency when he was ready to establish visitation. However, it was not until October of 2009 that Richard contacted the Agency and requested to be added to the case plan, and not until December of 2009, over a year-and-a-half after the Agency first contacted him

about the case, and nearly a year after paternity had been established, that Richard requested visitation with the E.J. and K.J.

{¶28} As of January of 2010, the record demonstrates that Richard had not complied with some of the minimal requirements of the case plan, such as attending parenting classes and completing a psychological evaluation, despite being provided with gas vouchers to make the drive from Columbus to Marion. On December 29, 2009, Richard tested positive for cocaine and marijuana on a random drug screen. On January 21, 2010, Richard missed a court-ordered visitation with the girls, without explanation. At this point in the proceedings, Richard had never met E.J. and K.J.

{¶29} In February of 2010, Richard was given another opportunity to reunify with E.J. and K.J. after the Agency agreed to withdraw its first motion of permanent custody. At the next scheduled visitation, Richard arrived thirty minutes late. The Agency's staff instructed him on the policy, which requires the parents to arrive to visitation on time, and there was no visit because of his tardiness. However, at the next visit Richard again arrived thirty minutes late, but the ongoing caseworker talked to the staff and permitted the visitation to occur. During March of 2010, Richard called the Agency to report that he ran out of gas on his way to a visitation. The Agency sent a maintenance worker to bring Richard some gas so that he could make it to the visitation.

**{¶30}** The Agency also continued to work with Richard to facilitate his completion of the case plan objectives. The Agency provided Richard with weekly gas vouchers to alleviate the financial burden of driving to Marion to visit with his children. The Agency made arrangements for Richard to complete some of the case plan objectives in Columbus so that he would not have to drive to Marion.

**{¶31}** Nevertheless, the Agency's primary concern was Richard's lack of appropriate housing and family support and his unstable income. Richard lived in a two bedroom apartment with his girlfriend and her nine-year-old son, where Richard and his girlfriend shared one room and the girlfriend's son slept in the other. Richard admitted that he had problems with his boss paying him his full paycheck each week, and that money had been an issue since his girlfriend broke her leg and was unable to work. The Agency added the objectives of Richard obtaining stable income and securing a bigger apartment to the case plan, giving Richard several months to remedy these issues. The ongoing caseworker, Randy Lee, testified that the Agency tried to assist Richard in obtaining appropriate housing by offering to pay the deposit and first month's rent on a three bedroom apartment. However, at the time, Richard did not have the finances to sustain a lease for a more expensive residence.

{¶32} In July of 2010, after he regularly attended his weekly onsite supervised visits with E.J. and K.J. for several months, the Agency arranged for Richard to have unsupervised offsite visits with the children. Mr. Lee recalled that Richard began missing visitations in October of 2010. He missed three consecutive visits beginning October 2, 2010, attended four visits, but then missed the last five visits of the year. In fact, Mr. Lee testified at the dispositional hearing in January of 2011, that Richard had not visited the children since November 13, 2010. Mr. Lee recalled that Richard explained that he had been in a car accident and lost his driver's license because he was uninsured at the time. Richard admitted that the Agency offered to provide him bus tickets from Columbus to Marion to visit the children, but that he declined because it would require him to spend the entire day in Marion as the bus to and from Columbus only stopped once in the morning and once in the evening.

{¶33} On appeal, Richard maintains that the Agency was unreasonable in keeping the children in Marion when it knew that he had transportation issues. Richard argues that the more reasonable measure would have been to transport the children to Columbus for visitation with him or to transfer the children's case to Franklin County Children Services.

{¶34} Mr. Lee testified that it was not feasible to transport the children to Columbus once a week because it would require two caseworkers to be present

and the agency did not have the extra personnel to spare. As previously discussed, the record supports that the Agency provided for alternative arrangements to assist Richard with his transportation problems, which Richard chose not to utilize. Richard provided no explanation for why taking the bus on Saturdays to visit his children was not a viable option, other than he did not want to be in Marion all day.

{¶35} Moreover, Richard's argument that the Agency should have transferred the children to Franklin County overlooks the primary focus of the case,—i.e., the best interest of the children. In the nearly two years that it took Richard to become actively involved in the case, E.J. and K.J. blossomed in their foster care placement. It is wholly unreasonable for Richard to expect the Agency to uproot the children from a stable, comfortable environment into placement in a new foster home in a different county, with different caseworkers, simply so the children can be closer to a parent who after two years of the case's progression has shown minimal interest, at best, in reunifying with them.

{¶36} Accordingly, we conclude that the Agency's case planning and efforts were reasonable and diligent under the circumstances of this case. The record is replete with instances, in which the Agency attempted to assist Richard with remedying the issues preventing him from reunifying with E.J. and K.J., but Richard chose not to participate in removing those barriers. Therefore, we find

that the trial court did not err when it determined that the Agency had made reasonable efforts to prevent removal of the children from Richard's home. Richard's third assignment of error is overruled.

*Richard's First, Second and Fourth Assignment of Error and Amy's*

*Assignment of Error*

**{¶37}** The remaining assignments of error each address the adequacy of the trial court's finding that it is in the best interest of the children to grant the Agency's motion for permanent custody.

**{¶38}** As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3rd Dist. Nos. 9–06–12, 9–06–13, 2006–Ohio–4841, citing *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, supra, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the Agency.

**{¶39}** Section 2151.414 of the Revised Code provides, inter alia, that a trial court:

**may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a)  The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, \* \* \* and *the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.***

**(b)  The child is abandoned.**

**(c)  The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)  *The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period* and \* \* \* the child was previously in the temporary custody of an equivalent agency in another state.**

R.C. 2151.414(B)(1)(a-d) (emphasis added).

{¶40} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Further, "[i]t is intermediate; being more than a mere preponderance, but not to the

extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.*, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); see, also, *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613.

{¶41} At the outset, we note that the parties do not dispute the finding of the trial court that the children have been in the Agency's temporary custody in excess of the required twelve or more months in a consecutive twenty-two-month period. See R.C. 2151.414(B)(1)(d). This finding alone provides the trial court with the appropriate grounds to grant the Agency's motion for permanent custody. However, the trial court made the additional finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a). The remaining assignments of error raised are related to this additional finding by the trial court, therefore, in the interest of justice we will address the arguments made regarding the adequacy of this specific finding.

**{¶42}** In regards to making a finding pursuant to R.C. 2151 .414(B)(1)(a)

that the children cannot be placed with either parent within a reasonable time or

should not be placed with either parent, the Revised Code states as follows:

> **(E) In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**
>
> **\* \* \***
>
> **(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

* * *

**(12)  The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.**

**(13)  The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.**

* * *

**(14)  The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

* * *

**(16)  Any other factor the court considers relevant.**

R.C. 2151.414(E) (emphasis added).

{¶43} In its judgment entry granting the Agency's motion for permanent custody, the trial court specifically discussed three of these factors as it relates to this case.

> **This Court finds by clear and convincing evidence that both E.J. and K.J. cannot be placed with either parent within a reasonable period of time and further, should not be placed with either parent due to the current circumstances of both parents with no expectation for improvement in the future.  Pursuant to Ohio Revised Code Section 2151.414(E)(1), both parents have failed to remedy the conditions which caused the children to be placed outside the home.  Both parents failed to substantially comply**

-21-

**with the case plan developed for this family, which provided for all the necessary services and resources made available to them which would have allowed them to resume and maintain their parental responsibilities and duties.**

**In addition, both parents have demonstrated a lack of commitment toward both children by their failure to regularly support or visit with the children and their inability to provide an adequate permanent home for the children pursuant to Ohio Revised Code Section 2151.414(E)(4). Both parents, by their failure to comply with the Case Plan, current incarceration, election to live away from the children without adequate transportation, employment sufficient to provide financial support, suitable stable housing and continued lack of commitment to the basic needs of the children have clearly demonstrated an unwillingness to provide food, clothing, shelter and other basic needs of the children pursuant to Ohio Revised Code Section 2151.414(E)(14).**

(JE, February 23, 2011, at 8-9).

**{¶44}** In his first assignment of error Richard argues that the record contained insufficient evidence for the trial court to find that the children cannot be placed with him in a reasonable amount of time pursuant to R.C. 2151.414(B)(1)(a). Specifically, Richard contends that the trial court made this finding simply because he is poor.[2]

---

[2] Amy's sole assignment of error argues that the trial court erred in finding that the children cannot placed with Richard in a reasonable period of time or the children should not be placed with Richard. Notably, she does not assign error to a similar finding made by the trial court regarding the children's placement with her. Without delving into a discussion of whether Amy even has standing to raise this assignment of error, we note that Richard assigns the same issue as error on appeal; therefore, by resolving Richard's assignment of error addressing this issue, the merits of Amy's assignment of error will also be addressed.

**{¶45}** Initially, we note that nowhere in the trial court's judgment entry does it refer to Richard's socio-economic class as a factor influencing its decision. However, what is prevalent throughout the decision is the trial court's discussion of Richard's *lack of commitment* to remedy the conditions, which warranted the children's continued removal from his home. Moreover, while the record reflects that it is Amy's incarceration, which originally prompted the Agency to be involved in this case, the trial court noted that it was Richard actions, or rather lack thereof, which contributed to its decision to grant permanent custody of the children to the Agency.

**{¶46}** As previously discussed, the record demonstrates that it took Richard over two years to become actively involved in the case plan. It was only after the Agency agreed to withdraw its first motion for permanent custody that Richard made *any* attempts to complete the minimal objectives in the case plan. In that hearing, the trial court advised Richard of the following:

> **I want you to understand the opportunity you're being given here. * * * And I want you to understand that this Court is not going to be inclined to listen to any excuses why you don't act as a proper parent for these two children. They're beautiful girls, deserving of a loving parent or parents, and this is your opportunity to step up and show that you do mean to be what is necessary to raise these children appropriately.**

> **Children Services is going to do what they can to work with you in that regard, but we're not looking to consider any excuses, so you better do what's necessary for these two kids.**

-23-

(Hrg. February 2, 2010 p. 106).

{¶47} The record demonstrates that on February 25, 2010, Richard met E.J. and K.J., for the first time, and began to exercise his weekly two-hour supervised visits with them. By May of 2010, Richard had completed parenting classes, the drug and alcohol assessment and the psychological assessment, all after the Agency made it more convenient for him by arranging for these sessions to take place near his residence. However, the larger and more pressing concern for the Agency was Richard's lack of adequate housing, stable income and family support to sustain his ability to adequately care for the children. The Agency's ongoing caseworker, Randy Lee, recalled that Richard understood the importance of completing these objectives in the case plan in order to obtain custody of his children.

{¶48} The record reflects that Richard did not even acquire a stable residence until September of 2009, when he moved into the two bedroom apartment where his girlfriend and her young son live. Mr. Lee testified that as early as May of 2010, he and Richard discussed finding more stable employment and suitable housing for the children. Both Mr. Lee and the GAL for the children completed multiple home studies and agreed that Richard's current living situation

was not appropriate for the girls because it was simply too small to accommodate five people.

{¶49} At the dispositional hearing, Richard admitted that his income as a mechanic had been lower than in the past because his work is inconsistent and that his employer often did not pay him a full paycheck, despite it being earned. Richard testified that he repeatedly tried to find other employment, but his prior felonies for drug possession prevented him from being hired. However, Mr. Lee testified that he was only aware of one occasion in the past several months, in which Richard attempted to find another job. Moreover, despite being asked repeatedly by the Agency, Richard never provided any proof of his income. Richard also explained that his girlfriend paid all the bills with her unemployment income and when the time came where she no longer received unemployment she would find other work.

{¶50} On cross-examination, Richard was asked if he thought he would be able to obtain enough income to support the girls. Richard was adamant that he is able to get enough income, when necessary, by way of working with private clients and collecting scrap metal. Richard was asked that if this was the case, what prevented him from getting a larger apartment to comply with the case plan. Richard simply responded that "it's just not that easy to go out and say, okay, I want a bigger place and move right in. * * * There's a process just like everything

else." (Tr. p. 288-89). Nevertheless, throughout his testimony Richard maintained that income was not the only issue preventing him from getting a suitable place for E.J. and K.J. to live.

{¶51} The record also demonstrates that throughout the proceedings transportation had been an issue for Richard. This problem became exacerbated when Richard's driver's license was suspended after he was involved in a car accident and he was not insured at the time. Notably, Richard also admitted to driving the children in his car while he was uninsured. As a result, Richard testified that he sometimes stays at his workplace for two-weeks at a time because he cannot afford to pay someone to drive him to and from work. Richard estimated it would cost him $700.00 to get his driver's license reinstated. Mr. Lee testified that the week before the dispositional hearing, he visited Richard's apartment and discovered that Richard had not stayed there for over a week because he had been sleeping at his employer's place of business.

{¶52} Richard also admitted that the only experience he had with raising children was with his girlfriend's nine-year-old son. Moreover, the record reflects that Richard had no family support to assist him with raising two toddler girls. Richard explained that his parents were elderly and no longer lived near him. Richard maintained that his girlfriend would watch the girls while he was at work or when he stayed at his employer's garage for a week at a time. Richard

-26-

explained that once his girlfriend found another job, he planned on sending the girls to daycare. However, when questioned about his plans, Richard admitted that he had not contemplated the details, such as how he could afford daycare for the two toddlers on his unsteady income. Moreover, Richard's girlfriend was not active in the case and provided no testimony at the hearing. Her involvement was limited to letting Richard use her car on occasion to visit the girls, and once she accompanied him to exercise his visitation, however she remained in the lobby while Richard visited with the girls in the back room of the facility.

{¶53} Mr. Lee was also concerned that Richard began missing his visits with the children in October of 2010, and then eventually stopped visitation all together. Mr. Lee questioned whether the children would even recognize Richard or be as approachable with him because of the amount of time that had elapsed since his last visitation with them. Mr. Lee explained that E.J. and K.J needed permanency in their lives and that the stress of being involved in a three-year-long case was beginning to show a detrimental effect on them. Mr. Lee felt that it is unfair for the girls to continue being in limbo. Mr. Lee testified that he believed Richard had enough time to achieve the objectives in the case plan to obtain consistent income and to acquire adequate housing for the children. Mr. Lee surmised that Richard simply showed a lack of commitment to completing the objectives of the case plan.

**{¶54}** The GAL on the case testified that she believed that Richard is not totally committed to getting custody of E.J. and K.J. Specifically, she testified that, in her opinion, Richard had "great opportunity" to get custody of the girls and that he has been given longer than usual to accomplish the objectives of the case plan and has not been able to do so. (Tr. p. 415). While the GAL acknowledged that Richard completed some of the requirements in the case plan, she believed that he failed to complete the more important objectives, such as "having the appropriate housing, place for the children to sleep, to play, to have appropriate transportation, to visit regularly, to have family support or some kind of support system." (Tr. p. 430). The GAL explained, "[a]nd I think more of what I have seen is that he dislikes some of the things that he is being asked to do or is not happy with them or disagrees with them, and, therefore, just doesn't do them." (Id.). The GAL specifically referenced the issue of Richard's indifference to obtaining an appropriate apartment as a prime example of Richard's lack of commitment to the case plan, which hindered the process of reunification. She explained, "there was a time period where [Richard] could have possibly gotten a living arrangement where the girls had a bedroom and been able to possibly start overnights, and that didn't happen." (Id.).

**{¶55}** Based on the foregoing evidence in the record, we conclude that the trial court's finding that the children cannot be placed with Richard within a

reasonable time or should not is supported by clear and convincing evidence and is not against the manifest weight of the evidence. The records supports the trial court's conclusion that Richard was given ample opportunity to remedy the conditions causing E.J. and K.J. to be placed outside his home, such as obtaining appropriate housing, and finding a steady flow of income, and that it was simply Richard's lack of commitment which prevented him from accomplishing these objectives.

{¶56} Although we conclude that the trial court's decision regarding R.C. 2151.414(B)(1)(a) was not against the manifest weight of the evidence, before granting permanent custody of E.J. and K.J. to the Agency, the trial court also had to find that permanent custody to the Agency was in the children's best interest. Richard contends in his second and fourth assignments of error, that the trial court erred in finding permanent custody is in the children's best interest. Richard also argues that the trial court's decision regarding the children's best interest was against the manifest weight of the evidence.

{¶57} In order to determine whether granting permanent custody to an agency is in a child's best interest, the trial court must consider all relevant factors, including, but not limited to, five enumerated factors listed in R.C. 2151.414(D). These factors are:

**(1)   The interaction and interrelationship of the child with the child's parent, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(2)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(3)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**

**(4)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and**

**(5)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶58} On appeal, Richard argues that the trial court did not adequately consider two of the five of these enumerated factors.   Specifically, Richard contends that "the Family Court failed to consider the interaction and interrelationship of the child [*sic*] with [him] and whether legally secure permanent placement could be achieved without a grant of permanent custody to the agency."  ( Richard's Brief, at 22).   Contrary to Richard's contentions, the trial court expressly stated that it had considered all of the best interest factors, including the two at issue, in its judgment entry granting permanent custody to the Agency.  Specifically, the trial court found the following in its decision:

> **In examining all the factors contained in [R.C.] 2151.414(D), including all other relevant factors presented with regard to both minor children, continuing their current placement with their foster care family is in their best interests. This is evident by the improvement, bonding, and integration in the foster family. Both children have resided outside of the care and custody of either parent for all but two weeks since their date of birth on February 26, 2008, far in excess of the required twelve or more months in a consecutive twenty-two month period, and both children are in need and deserving of a legally secure permanent placement, and the current and continuing circumstances of both parents prevent this from occurring without a grant of permanent custody to [the Agency]. Mother's continued incarceration prevents her from any opportunity to provide for the needs of her children in the foreseeable future. Father's unwillingness to provide suitable adequate housing, sufficient employment for financial resources and commitment of time to his children for visitation and establishment of the parent-child relationship clearly indicates the inability of the children to be placed with the Father in the foreseeable future.**

(JE, February 23, 2011 at 7).

{¶59} The record clearly supports the trial court's findings in this regard. Mr. Lee testified that he has been actively involved in Richard's visitations with the children. Mr. Lee recalled that it naturally took E.J. and K.J. some time to warm up to Richard; however as Richard's visitations became more consistent, the girls acclimated to their weekly visits with him. Nevertheless, at the dispositional hearing, Mr. Lee was concerned that the girls might not even recognize Richard, since they had not seen him since he ceased to exercise his visitation in November of 2010.

{¶60} Mr. Lee testified that he visits the children monthly in their foster home placement. He described the girls being at ease in the home. Mr. Lee testified that E.J. and K.J. have blossomed in their current foster home placement. He explained that the foster parents were committed to addressing the children's developmental concerns. In the time that girls have been in the care of their current foster parents, E.J. and K.J. completed speech therapy and continued their physical therapy. Mr. Lee observed that the girls even referred to their foster parents as "mommy" and "daddy."

{¶61} In addition, the GAL provided the following testimony regarding the children's best interests. "[M]aybe two years from now, a year from now, three years from now, I don't know, maybe father could pull it together, but now he's not pulling it together and I think now is the time that these children need stability and security." (Tr. p. 417-18). She continued, "how long do we ask the children to be put under stress in order to give parents a chance to maybe pull themselves together down the road? I think it's been long enough * * *." (Tr. p. 419). The GAL concluded, "[t]hey've spent three years of their lives being shuttled and dependent and I think it's time that they get the stability they need, and I think it's in their best interest that Children Services has the [*sic*] permanent custody * * *." (Tr. p. 418).

{¶62} The initial caseworker on E.J. and K.J.'s case from February 2008 to April 2009, Ms. Johnson, testified that the Agency contacted eight different friends and relatives that Amy suggested as alternatives to placing the children in the Agency's custody. These contacts included a cousin of Amy's, who has custody of Amy's older child previously adjudicated dependent. Ms. Johnson testified that no one except for a friend named Kelly Igoe was willing to take custody of the children. Ms. Johnson explained that the Agency looked into Kelly Igoe as a possible placement, but her home was not appropriate for the girls because it did not have working plumbing. There was also evidence that Ms. Igoe was involved in a prior abuse/dependence/neglect situation in a different county. Moreover, Amy was actually living with Ms. Igoe when the children were removed from her care for the second time after the incident in which K.J., who was eight-months-old at the time, swallowed the opiate pill. As previously mentioned, the Agency contacted Richard's parents and sister about possible placement for the children. All three were unwilling to take custody of the two girls.

{¶63} Given the evidence before the trial court, we find that the trial court did not err in determining that granting permanent custody of E.J. and K.J. to the Agency was in the children's best interest. The trial court specifically stated it

considered the best interest factors in its decision to grant permanent custody of E.J. and K.J. to the Agency and its findings are supported by the record.

{¶64} For all of these reasons, we do not find that the trial court's granting of permanent custody was against the manifest weight of the evidence. Accordingly, Richard's first, second and fourth assignments of error and Amy's sole assignment of error are overruled.

*Judgments Affirmed*

**ROGERS, P.J. and PRESTON, J., concur.**

**/jlr**